## IN THE COURT OF COMMON PLEAS
## FRANKLIN COUNTY, OHIO
## CIVIL DIVISION

| | | |
|---|---|---|
| MARYAM BOUHOUCH, | : | |
| 3577 MCCALLUM CLUB | : | CASE NO. |
| Columbus, OH 43219, | : | |
| | : | JUDGE |
| Plaintiff, | : | |
| | : | |
| v. | : | **COMPLAINT** |
| | : | |
| MALL PROPERTIES, INC., | : | |
| c/o Corporation Service Co. | : | |
| 50 W. Broad St., Ste. 1330 | : | |
| Columbus, OH 43215, | : | |
| | : | **Jury Demand Endorsed Hereon** |
| Defendant. | : | |

## I.   Preliminary Statement

1.      This action seeks compensatory and punitive damages; declaratory, injunctive, and equitable relief; prejudgment and post-judgment interest; and costs and attorneys' fees for the religious discrimination in violation of the Ohio Laws Against Discrimination committed by Defendant in (a) refusing, even though it could have done so without undue hardship, to accommodate Plaintiff's request, based on her sincerely-held Muslim beliefs, to wear a hijab while performing her duties as a barista in its grab-and-go restaurant; and/or (b) actually or constructively discharging Plaintiff when it forced her to choose between resigning and working without her hijab and she chose to continue wearing her hijab.

## II.   Jurisdiction and Venue

2.      This action arises under the Ohio Laws Against Discrimination, R.C. 4112.99.

3.      This Court has jurisdiction over this action by virtue of R.C. 2305.01.

1

4.      Declaratory, injunctive, and equitable relief are sought pursuant to R.C. 4112.99; Civ.R. 65; and the common law of the State of Ohio.

5.      Compensatory and punitive damages are sought pursuant to R.C. 4112.99 and the common law of the State of Ohio.

6.      Costs and attorney fees may be awarded pursuant to the common law of the State of Ohio.

7.      Venue lies in this forum because Plaintiff performed her job duties for Defendant in and around Franklin County at its Hilton Columbus at Easton ("Hilton"), 3900 Chagrin Drive, Columbus, Ohio, 43219, and the decisions adversely affecting her employment were made there.

**III.    Parties**

8.      Plaintiff Maryam Bouhouch, who was born in Morocco, a Kingdom in North Africa and speaks and writes English as a second language, lawfully immigrated to the United States; began working as a full-time barista at Defendant's Herb N' Kitchen, which is Hilton's grab-and-go restaurant, on or around May 20, 2019, after having been hired on May 15, 2019; was paid $10.00 per hour plus tips, which were calculated at 20% of food and beverages sold, with total compensation in the range of $31.25 - $32.89 per hour; and was actually or constructively discharged on July 18, 2019.

9.      Defendant Mall Properties, Inc., a foreign corporation registered with the State of Ohio, is a subsidiary of Olshan Properties and its Olshan Hotel Management, Inc., which owns or operates commercial real estate throughout the United States, including Hilton where more than 200 individuals are employed; and is an employer as defined and covered by the Ohio Laws Against Discrimination.

**IV.    Facts**

2

10.     Plaintiff sincerely believes in the Muslim religion.

11.     Plaintiff strives to conform to the practices of devout believers in the Muslim religion.

12.     Since coming to the United States, Plaintiff has feared discrimination against individuals who appear to be devout Muslims.

13.     To avoid such discrimination, Plaintiff has at times deviated from the practices of devout believers in the Muslim religion; for example, she did not wear a hijab for the picture taken for an Ohio Driver's License ███████████████████████ pplied to become employed by Defendant, though she wore one in her immigration visa application picture, and a copy of the Visa showing her wearing a hijab was supplied to Defendant during her hiring process.

14.     A hijab is a traditional covering for the hair and neck worn by Muslim women to comply with the modesty dictate of the Qur'an (or Koran), the Muslim bible, that women should not display their "ornaments," including hair, except to their family.

15.     Sincerely devout Muslims vary in how much they cover women's hair, ranging from a bandanna or headscarf, through a niqab, which leaves nothing exposed but the eyes, to a burqa, which adds to a niqab a screen for the eyes.

16.     Defendant has a grooming, dress and/or apparel code for Hilton employees which prohibits the wearing of a bandanna or any other headscarf by baristas and other employees who regularly come into contact with the public.

17.     During the early days of her employment as a barista, Plaintiff did not wear her hijab at work, taking it off when she arrived in the Hilton parking lot and putting it back on when she left.

3

18.     The duties of a Hilton barista are primarily to serve customers coffee, tea, and related refreshments, starting with inquiries about their preferences and orders, explaining the coffee and tea options, answering customer questions, fulfilling their orders by following prescribed recipes and preparation techniques, ensuring available inventory, maintaining equipment in working order or seeking repair, and ensuring a safe, clean working environment, and secondarily to deliver food ordered by hotel guests through room service.

19.     Those duties do not include cooking food.

20.     At no time did Plaintiff in performing the duties of a Hilton barista come in contact with or close proximity to open flames or other equipment, such as deep fryers, grills, or ovens, which could set a bandanna or headscarf on fire.

21.     During her tenure Plaintiff was in a position to observe the way other Hilton baristas performed their job duties.

22.     At no time did Plaintiff in observing the way other Hilton baristas performed their job duties see anyone come in contact with or close proximity to open flames or other equipment, such as deep fryers, grills, or ovens, which could set a bandanna or headscarf on fire.

23.     Food ordered by hotel guests through room service was placed by cooks for baristas to pick up in a space sufficiently distant from cooking surfaces to avoid any real risk of setting a bandanna or headscarf on fire.

24.     Plaintiff competently performed the job duties of a barista and was never formally disciplined.

25.     Once Plaintiff had demonstrated how much she could contribute to Defendant's operations through her job performance, she decided to start wearing her hijab at work.

26.    Plaintiff was told that her coworkers did not like her wearing a hijab and it was not part of her uniform.

27.    Plaintiff stopped wearing a hijab for a while but then decided that she had to practice her religion.

28.    In an effort to satisfy her coworkers and comply as much as she could with the Hilton grooming code, Plaintiff varied the size, shape, and color of her hijabs, selected a smaller one she could tie behind her ears, and discussed with supervisors what would be deemed acceptable under the code.

29.    Plaintiff was told by her kitchen supervisors that none of her variations complied with the Hilton grooming code.

30.    At no time did her kitchen supervisors tell her that her wearing a hijab posed a safety risk.

31.    Conflicted by her need for her job and Defendant's enforcement of the Hilton grooming policy, Plaintiff again stopped wearing a hijab.

32.    In discussing the situation with her parents, who were extremely upset about her not being allowed to wear a hijab, she decided that she had to observe her religion.

33.    She explained to her supervisors that her religion required her to wear a hijab and her parents were extremely upset about her not doing so.

34.    On Sunday, July 14, 2019, Plaintiff wore a hijab at work, and the shift Kitchen Manager, whose last name is Clemmons, noticed her hijab.

35.    Kitchen Manager Clemmons told Plaintiff to remove the hijab because it violated Hilton policy.

5

Franklin County Ohio Clerk of Courts of the Common Pleas- 2020 Jul 16 8:41 AM-20CV004311

36. Kitchen Manager Clemmons was a supervisor of Plaintiff, empowered to impose or secure discipline for her actions.

37. Plaintiff explained that she wore the hijab because of her religion and was uncomfortable with her head uncovered.

38. Kitchen Manager Clemmons responded in words to the effect of, "The rules are the rules," and she had to remove her hijab.

39. Plaintiffs tried to contain her emotions, though inside she was scared, upset, and sad; did not raise her voice or engage in an argument; and removed her hijab for the remainder of her shift.

40. On Monday, July 15, 2019, Plaintiff again wore her hijab, hoping that once she explained to upper management why she wore a hijab and how the size and style of her hijab was not distracting or a safety risk, Defendant would permit her to observe her religion.

41. Plaintiff spoke with Hilton Director of Human Resources Mary Faust and her Assistant, Donna Pagano.

42. Hilton Director of Human Resources Faust and her Assistant told Plaintiff that wearing a hijab was against corporate policy because it was inconsistent with Hilton's grooming policy or dress code and not part of the uniform Hilton issued to her.

43. Hilton Director of Human Resources Faust and her Assistant told Plaintiff that she would have to remove her hijab.

44. Plaintiff told them that she had two friends who could fill a job opening for a Hilton barista, but both wore a hijab.

45. Plaintiff asked whether they could apply for the available barista position.

6

46.     Hilton Director of Human Resources Faust told Plaintiff that her friends need not apply if they wore hijabs.

47.     Plaintiff could not believe that she had to choose between observing her religion and keeping her job, and she sought out Kitchen Supervisor Ryan Brewer, Kitchen Manager Mike Carmody, and the overall Kitchen Manager, Michael Jenkins, to talk about what she could do.

48.     Plaintiff asked Kitchen Supervisor Brewer why Hilton housekeepers were permitted to wear hijabs while baristas were not.

49.     Kitchen Supervisor Brewer answered with words to the effect of housekeepers being "back of the house personnel" rather than "guest facing" or front of the house personnel as baristas were.

50.     Human Resources Director Faust indicated that hijabs posed a safety risk because baristas were serving hot coffee and interacting with dangerous equipment.

51.     During her tenure Plaintiff never experienced or observed any safety risk from apparel catching on fire from hot coffee or barista interacting with dangerous equipment.

52.     In her discussions and communications during the week of July 15, 2019, Plaintiff was told that Defendant was firm and consistent in requiring everybody in the kitchen to comply with the Hilton grooming policy.

53.     In her discussions and communications during the week of July 15, 2019, Plaintiff was told that Defendant provided her a uniform, the hijab was not part of the uniform, and it required employees to wear the uniform it had provided them.

54.     In her discussions and communications during the week of July 15, 2019, Plaintiff was repeatedly told that she had two options: stop wearing the hijab or resign.

7

55.     In her discussions and communications during the week of July 15, 2019, Plaintiff repeatedly explained that she loved her job and wanted to continue working, rather than resign, but had to observe her religion.

56.     Plaintiff was also told during some of the discussions and communications that continuing to wear the hijab was disobedient of her supervisor and disrespectful toward him and the Hilton.

57.     Plaintiff point blank asked during some of these discussions and communications what would happen if she continued to wear her hijab and was answered that she would be disciplined for being disobedient or would be resigning, which was completely her decision with her, not Defendant, deciding her fate.

58.     Plaintiff explained during one or more of these discussions and communications that she was going to continue to wear her hijab and it was Defendant's, not her, decision to make about whether to continue her employment.

59.     On July 18, 2019, Plaintiff, wearing her hijab, worked a shift beginning at 5:30 a.m. and was approached by a supervisor at approximately 7:00 a.m. who said "we need to talk to you for a minute."

60.     Plaintiff then met that supervisor and Director of Human Resources Faust, and they reiterated that she had two choices: remove her hijab or resign.

61.     Later that day, Director of Human Resources Faust told her that, if she did not stop wearing a hijab, Defendant would "have to let her go" or words to that effect.

62.     Again, controlling her emotions even though she felt like bursting into tears, screaming for fairness, or strenuously arguing against how Defendant was treating her, Plaintiff continued to wear her hijab.

8

63. Before Plaintiff's shift ended, Director of Human Resources Faust asked her for her keys to her work locker and her Hilton-issued uniforms; Plaintiff went to the restroom, changed from her Hilton uniform to the clothes she had in her locker, and gave all of her uniforms to Director Faust.

64. Director of Human Resources Faust further said Plaintiff's job would end and she should not come to work for her next scheduled shift, discussed the deposit of her final paycheck, wished her luck, and walked her to the door.

65. Director of Human Resources Faust explained that she had to attend a meeting, but would call Plaintiff within a few days if she wanted to discuss further what had happened.

66. Plaintiff believed that she had been discharged for not removing her hijab and asked Director of Human Resources Faust if she had been fired.

67. Director of Human Resources Faust replied that she had not been fired.

68. Director of Human Resources Faust characterized Plaintiff as resigning, rather than being fired.

69. Plaintiff had been advised during her discussions and communications to write a resignation letter.

70. Defendant consistently told Plaintiff that she was to blame for losing her job if she continued to wear her hijab, it had informed Plaintiff of the grooming policy and uniform requirements, and she had decided to violate the policy and wear a hijab which was not part of its uniform.

71. Plaintiff consistently responded that she did not want to resign.

72. Defendant told Plaintiff that she had to put her resignation in writing.

73. Plaintiff never wrote a resignation letter.

9

74. Defendant characterized her as resigning because it knew that discharging her would expose it to liability for religious discrimination and, conceivably, unemployment compensation.

75. The choice Defendant forced on Plaintiff in lieu of accommodating her religion created an intolerable working environment, one Defendant purposely inflicted knowing that she would choose her religion over her job.

76. Regardless of whether she had been fired or deemed to have resigned, Plaintiff knew that she no longer worked for Defendant because she chose her religion.

77. Plaintiff was so distraught that she reached out the night of the 18th or the next day to the corporate offices of both Hilton Hotels and Resorts and Defendant, but she did not receive a return telephone call.

78. On the evening of July 18, 2019, Plaintiff communicated with Director of Human Resources Faust: "Just Emailing to see if I'm still not allowed to come to work!?  And see if any update from you!!  Just let me know what did you decided?  You and Michael!  Please let me know you know I need this job and I'm working hard, I love to work with you all[.]"

79. Director of Human Resources Faust responded the same evening, denying that she had told Plaintiff not to come to work and explaining -- "You were informed you need to comply with our grooming standards and we concerned for your safety." – and saying she would call to set up a meeting.

80. On July 19, 2019, Plaintiff dual-filed administrative charges with the Ohio Civil Rights Commission and the Equal Employment Opportunity Commission.

10

81.     On July 21, 2019, Defendant's Assistant Food and Beverage Manager Brooke Walton communicated to Plaintiff about her shift on Sunday and asked about her plans for the next scheduled shift on Tuesday.

82.     Plaintiff responded that Director of Human Resources Faust had fired her, taking her uniform and keys, because she wore her hijab in violation of Hilton's grooming policy and uniform requirements.

83.     Assistant Food and Beverage Manager Walton shared her email and Plaintiff's response with Director of Human Resources Faust and Kitchen Manager Carmody.

84.     On July 23, 2019, after Plaintiff had already filed a dual charge of discrimination with the Ohio Civil Rights Commission and the Equal Employment Opportunity Commission, the Director of Human Resources Faust emailed Plaintiff that she had definitely not been fired, nor had she been ordered to return her uniform or keys or walked to the door as part of a discharge, but rather simply to confirm that she and a kitchen manager would call Plaintiff on Friday; she had called to confirm Plaintiff's Sunday work schedule; and she was happy to meet to resolve the misunderstanding and Plaintiff should come to work as scheduled.

85.     Plaintiff was astounded by that email.

86.     The next day, Plaintiff replied to Director of Human Resources Faust, saying there was no misunderstanding; she had repeatedly been told her only options were to resign or not wear her hijab; she had repeatedly explained that she did not want to resign but wanted to wear the hijab for religious reasons; she had asked what would happen if she continued to wear the hijab and was told Defendant would have to discipline her for disobedience and let her go; and that supervisors were working to change the policy but, until it changed, she had to comply.

87.     It is Plaintiff's belief that by July 23, 2019, Director of Human Resources Faust

11

had learned that Plaintiff had called Defendant's corporate office and dual-filed administrative charges of discrimination.

88.     It is Plaintiff's belief that by July 23, 2019, Director of Human Resources Faust realized that she had exposed Defendant to liability for religious discrimination.

89.     By July 23, 2019, Director of Human Resources Faust decided to blame Plaintiff for misunderstanding what had happened.

90.     At all times material to this action, Director of Human Resources Faust knew that Plaintiff's grasp of the English language sufficed for understanding what was being said to her.

91.     At no time material to this action did Defendant have difficulty with Plaintiff understanding communications to her regarding her job duties, Hilton policies, or what would happen if she continued to wear her hijab.

92.     The decision by Director of Human Resources Faust to blame Plaintiff for misunderstanding what had happened was based up and used to exploit stereotypes that immigrants from Africa lacked the ability to understand accurately and clearly communications in English or about employment policies and practices.

93.     At all times material to this action Plaintiff understood accurately and clearly what she was told.

94.     On August 6, 2019, counsel for Defendant wrote to undersigned counsel that Plaintiff had never raised her religious need to wear a hajib before she filed her administrative charges; Defendant would welcome Plaintiff coming back to work because she was not terminated and her position was still open and available; if Plaintiff would contact Director of Human Resources Faust to discuss an accommodation, Defendant would be happy to provide a reasonable accommodation to her religious needs; and she would not be retaliated against.

12

95.    The subsequent November 11, 2019 affidavits of Defendant's employees Christopher (Ryan) Brewer, Clement Nduwayo, Michael Carmody, Donna Pagano, and Brooke Walton filed with the Ohio Civil Rights Commission clearly show that Plaintiff raised her religious need to wear a hajib before she filed administrative charges, which directly contradicts Defendant's prior claim that the issue had not previously been raised.

96.    In Christopher (Ryan) Brewer's affidavit he swore that "[M]s. Bouhouch appeared to work with a full head scarf. I again told her that it's not a part of her uniform. At that time, she told me it was for religious beliefs."

97.    In Clement Nduwayo's affidavit he swore that, "[I] recall that she showed up wearing a red bandana. I told her that was not part of her uniform. She asked me if she could wear a hijab. . . [O]n the next day, July 15, 2019, she showed up wearing a hijab. I told her I would ask Brooke Walton, Dining Room Manager, if she could wear that."

98.    In Michael Carmody's affidavit he swore that, "[I]n July, I saw that she was wearing a head scarf. Again, I told her it was not a part of the uniform. . . [L]ater I learned from other staff that she wanted to wear head gear for religious reasons."

99.    In Donna Pagano's affidavit she swore that, "[I]n July, I heard that she wore a hijab to work and was talking to the other managers and Mary Faust, Director of HR."

100.    In Brooke Walton's affidavit she swore that, "[S]he did tell me that she is Muslim and did asked (sic) about accommodations for taking breaks during Ramadan. . . [I] never saw her wear a head band or covering, although I understand from Mr. Nyuwayo (sic) and Mr. Brewster that she did."

101.    Defendant lied about Plaintiff never raising her religious need to wear a hajib before Plaintiff filed administrative charges.

13

102.    Defendant lied about Plaintiff never being terminated.

103.    Defendant knew before Plaintiff filed her administrative charges that the only accommodation she sought was being allowed to wear her hijab while working as a barista.

104.    Plaintiff saw no reason to discuss with Director of Human Resources Faust an accommodation after August 6, 2019, when she had previously had so many discussions and communications with Director of Human Resources Faust about the only accommodation she sought.

105.    The failure of the August 6, 2019 letter to address the only accommodation she had sought and the lies in that letter convinced Plaintiff that Defendant had not made a good-faith, unconditional offer of reinstatement to the position of barista with the right to wear her hajib during work.

106.    Plaintiff decided to pursue her rights before the Ohio Civil Rights Commission and the Equal Employment Opportunity Commission and to commence litigation rather than further engage with Defendant in light of the omission in the August 6, 2019 letter of the only accommodation she had sought and the lies there.

107.    At all times material to this action Defendant's upper management and kitchen supervisors knew that Plaintiff was wearing a hijab because of her Muslim religion.

108.    At no time material to this action did Defendant's upper management and kitchen supervisors believe that Plaintiff was wearing a hijab as a fashion statement.

109.    At no time material to this action did Defendant offer Plaintiff a transfer to housekeeping.

110.    At all times material to this action Defendant knew that the terms and conditions of a housekeeper position were considerably different from those of a barista position.

14

111.   At all times material to this action Plaintiff communicated to Defendant how much she loved her work as a barista.

112.   At all times material to this action Plaintiff communicated to Defendant that she and her family needed the income from her job as a barista.

113.   As a direct and proximate result of Defendant's discrimination, Plaintiff has suffered, and continues to suffer, emotional distress, humiliation from the paternalistic and condescending manner in which she was treated, and insult due to the false accusation of being disobedient and disrespectful.

114.   Despite reasonable efforts to secure employment comparable to her position with Defendant, Plaintiff has been unable to do so.

115.   In terminating Plaintiff, Defendant acted with grossly reckless disregard toward her right not to be a victim of religious discrimination.

**V.   Claim for Relief: Religious Discrimination under the Ohio Laws Against Discrimination**

116.   Paragraphs 1 through 115 above are realleged and incorporated herein.

117.   By refusing, even though it could have done so without undue hardship, to accommodate Plaintiff's request, based on her sincerely-held Muslim beliefs, to wear a hijab while performing her duties as a barista in its grab-and-go restaurant; and/or actually or constructively discharging Plaintiff when it forced her to choose between resigning and working without her hijab and she chose to continue wearing her hijab, Defendant violated the Ohio Laws Against Discrimination.

**VI.   Prayer for Relief**

WHEREFORE, Plaintiff prays that this Court:

a. declare that Defendant has violated the Ohio Laws Against Discrimination by committing religious discrimination; and

b. order such equitable relief, including reinstatement, as will make her whole; more than $25,000 in compensatory damages; more than $25,000 in punitive damages; prejudgment and post-judgment interest; costs; attorneys' fees, and such other relief as the Court may deem appropriate.

Respectfully submitted,

By: */s/ Helen M. Robinson*
Helen M. Robinson (0097070)
(*hrobinson@marshallforman.com*)
John S. Marshall (0015160)
(*jmarshall@marshallforman.com*)
Edward R. Forman (0076651)
(*eforman@marshallforman.com*)
Samuel M. Schlein (0092194)
(*sschlein@marshallforman.com*)
Madeleine J. Rettig (0098816)
(*mrettig@marshallforman.com*)
MARSHALL AND FORMAN LLC
250 Civic Center Dr., Suite 480
Columbus, Ohio 43215-5296
(614) 463-9790
Fax (614) 463-9780

**OF COUNSEL:**
Louis A. Jacobs (002101)
(*LAJOhio@aol.com*)
177 19th St., Apt. 9C
Oakland, CA 94612
(614) 203-1255
Fax (510) 250-9007

**JURY DEMAND**

Plaintiff requests a trial on all issues triable to a jury by a jury of eight (8) persons.

By: */s/ Helen M. Robinson*
Helen M. Robinson (0097070)

16